IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN PROTECTION INSURANCE      )
COMPANY,                           )
                                   )
                    Plaintiff,     )
                                   )
         v.                        )      No.  05 C 874
                                   )
AIRBORNE, INC., etc.,              )
                                   )
                    Defendant.     )

MEMORANDUM OPINION AND ORDER

In this diversity action American Protection Insurance

Company ("American Protection") charges Airborne, Inc.

("Airborne") with breach of an American Protection policy

("Policy") that provided automobile liability insurance.[1]

American Protection claims that Airborne must reimburse it for a

$1 million deductible amount that American Protection paid out as

part of a $2.85 million settlement with a third-party claimant

against Airborne.  Airborne responds that under the Policy

American Protection was not entitled to settle the third-party

claim over Airborne's objection--Airborne wanted to try its luck

at trial-- so that American Protection is not entitled to

reimbursement of any of the deductible amount.

_____

[1] Although Airborne is now known as DHL Express, Inc., this
opinion will adhere to the Airborne name in which the Policy was
written and in which this action was brought.  As for the Policy
itself, it comprises (1) an umbrella contract between Airborne
and several of the Kemper Insurance Companies, providing for
various types of coverage, plus (2) the extensive documentation
through which American Protection provides part of that coverage.

Both parties now move for summary judgment under Fed. R.
Civ. P. ("Rule") 56. For the reasons stated in this memorandum
opinion and order, American Protection's motion is granted, while
Airborne's motion is accordingly denied.

<u>Standard of Review</u>

Under familiar Rule 56 principles, a movant for summary
judgment bears the burden of establishing the absence of any
genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 322-23 (1986)). For that purpose courts consider the
evidentiary record in the light most favorable to nonmovants and
draw all reasonable inferences in their favor (<u>Lesch v. Crown
Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). But to
avoid summary judgment a nonmovant "must produce more than a
scintilla of evidence to support his position" that a genuine
issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d
619, 625 (7th Cir. 2001)). Ultimately summary judgment is
appropriate only if a reasonable jury could not return a verdict
for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
248 (1986)).

One more complexity is added here, where cross-motions for
summary judgment are involved. Those same principles require the
adoption of a dual perspective that this Court has sometimes
referred to as Janus-like: As to each motion the nonmovant's

version of any disputed facts must be credited.[2]

Finally, as a federal court sitting in diversity, this Court is charged with applying state law (in this instance Illinois law[3]) to resolve all substantive questions (<u>M.T. Bonk Co. v. Milton Bradley Co.</u>, 945 F.2d 1404, 1407 (7th Cir. 1991)). What follows then are (1) a summary of the facts that either are undisputed or are viewed in the light most favorable to Airborne (as the party that has ultimately come up short) and (2) an application of Illinois substantive law to those facts.

<u>Background</u>

American Protection issued the Policy to Airborne covering Airborne for liability arising from auto accidents from January 1, 2001 to January 1, 2002, then renewed the coverage through January 1, 2003 (A.P. St. ¶5). Its coverage limit was $2 million (<u>id</u>. ¶5), subject to a "Deductible Amount" (a defined term that, as with all defined terms, appeared in boldface throughout the

---

[2] This District Court's LR 56.1 implements Rule 56 by requiring the submission of evidentiary statements and responses to such statements to highlight which facts are in dispute and which are not. This opinion will cite Airborne's and American Protection's respective LR 56.1 statements as "A. St. ¶--" and "A.P. St. ¶--," and Airborne's responsive statement as "A. Resp. St. ¶--."

[3] Paragraph VIII.C. of the Policy's General Terms and Conditions specifies:

This Agreement will be deemed to have been entered in the State of Illinois and will be governed by the laws of the State of Illinois.

3

document) of $1 million per accident (A. St. Ex. 31, Schedule).
Section I Paragraph A of the Policy's Endorsement No. 10
specified (id.):

> Our obligation to pay damages on behalf of the insured
> applies only to that amount of the Limits of Insurance
> that remains after deducting the Deductible Amount
> stated in the Schedule of this endorsement.

On September 13, 2002 a lawsuit was filed against Airborne
in a Nevada state court (the "Garcia Action"), alleging that one
of Airborne's trucks had collided with the plaintiff
motorcyclist, causing him major trauma including head injury (A.
Resp. St. ¶16). Although that action was within the Policy's
coverage (A. St. ¶5), Airborne itself--led by its in-house legal
counsel Mark Dietz ("Dietz")--undertook the investigation and
defense of the litigation, as it had the right to do (id. ¶¶12,
23). Dietz and his outside counsel developed multiple defenses
to the Garcia Action, taking the positions that the truck driver
(1) was an independent contractor and not an Airborne employee,
(2) was acting beyond the scope of his employment and (3) was
guilty of contributory negligence (id. ¶¶6, 8, 10). Because
Airborne believed those defenses had a strong likelihood of
success, it took a "no pay" position--a posture that was in line
with its typical practice in such litigation (id. ¶11).

Given the Garcia Action plaintiff's significant injuries,
Airborne was required to notify American Protection of the suit,
and it did so by notifying Joan Honan ("Honan," a claims adjuster

4

at American Protection) in April 2004 (A. St. ¶¶15-16). American Protection largely sat back and allowed Airborne to continue to take the lead in the litigation (id. ¶13). Although Airborne refused to consider settlement, its excess coverage insurer National Union Fire Insurance Company (A.P. St. ¶22)("AIG," the acronym for the parent company of that excess coverage insurer and the name regularly used by the litigants in their papers), which had also become involved in the dispute, repeatedly requested Airborne to make its $1 million in Deductible Amount funds available for settlement (A.P. St. ¶24). Handling the case for American Protection, Honan believed that Airborne had control over whether it would do so--an understanding that she communicated to Airborne (see, e.g., A. St. ¶¶24, 26, 39-40).

That state of affairs continued until October 2004, when the Garcia Action plaintiff filed an offer of judgment for $2.999 million (A.P. St. ¶25). Shortly thereafter AIG informed Honan that under its reading of the Policy, American Protection had the power to settle the Garcia Action without Airborne's consent, with the concomitant right to require Airborne to cough up the $1 million Deductible Amount. AIG encouraged American Protection to do so, given its view of its own potential exposure should the case go to trial (A. St. ¶41).

On November 16, 2004 Honan wrote Dietz a letter articulating that reading of the Policy and notifying Airborne that American

Protection intended to settle the <u>Garcia</u> Action with or without Airborne's consent and would then seek reimbursement of the applicable Deductible Amount from Airborne (<u>id</u>. ¶43).  In response Airborne objected to the use of Airborne's funds to effect settlement and reiterated its intention to pursue its defenses through trial if necessary (<u>id</u>. ¶46).

Despite that objection American Protection went ahead and settled the Garcia Action for $2.85 million, of which $1 million was paid by a contribution from still another insurer (not now at issue), while the remaining $1.85 million was paid by American Protection (A.P. St. ¶31).  Airborne has refused American Protection's request for reimbursement of the $1 million Deductible Amount, instead challenging American Protection's right to have settled the action without its consent while looking to Airborne for participation (<u>id</u>. ¶32).  That dispute in the reading of the Policy has led to this action.

<u>Power To Settle over Airborne's Objection</u>

This Court's first chore is to determine American Protection's and Airborne's respective rights as to settlement of claims under the Policy.  <u>Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.</u>, 223 Ill.2d 407, --, 860 N.E.2d 280, 285-86 (2006)(numerous citations omitted) has recently distilled the principles of such insurance contract interpretation--a question of law--in Illinois:

Insurance policies are subject to the same rules of construction applicable to other types of contracts. A court's primary objective is to ascertain and give effect to the intention of the parties as expressed in the agreement. In performing that task, the court must construe the policy as a whole, taking into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.

The words of a policy should be accorded their plain and ordinary meaning. Where the provisions of a policy are clear and unambiguous, they will be applied as written unless doing so would violate public policy. That a term is not defined by the policy does not render it ambiguous, nor is a policy term considered ambiguous merely because the parties can suggest creative possibilities for its meaning. Rather, ambiguity exists only if the term is susceptible to more than one reasonable interpretation.

Because insurance contracts are issued under given circumstances, they are not to be interpreted in a factual vacuum. A policy term that appears unambiguous at first blush might not be such when viewed in the context of the particular factual setting in which the policy was issued. Governing legal authority must, of course, be taken into account as well, for a policy term may be considered unambiguous where it has acquired an established legal meaning. Where ambiguity does exist, the policy will be construed strictly against the insurer, who drafted the policy, and liberally in favor of coverage for the insured.

American Protection finds its right to settle the underlying third-party lawsuit in this case over Airborne's objection in a portion of the Policy's Endorsement No. 10 that follows the provision quoted in the Background section of this opinion--its Section II Paragraph A ("Paragraph II.A," St. Ex. 31 (emphasis added)):

A.   We shall have the right, but not the duty or obligation to:

1. defend or participate in the defense of any "suit" against the insured and

2. investigate and <u>settle any "accident," claim or suit</u>.

Read alone, that language unambiguously gave American Protection the right to settle the third-party claim involved here without Airborne's consent.

Moreover, Illinois caselaw (like the decisions in a majority of jurisdictions that have considered similar language) has held that an insured cannot complain that such a provision inevitably allows an insurer to commit an insured's funds--the policy deductible--without the insured's consent, because that is exactly the bargain that the insured struck under the policy that it bought and paid for (<u>Casualty Ins. Co. v. Town & Country Pre-Sch. Nursery, Inc.</u>, 147 Ill.App.3d 567, 569-70, 498 N.E.2d 1177, 1178-79 (1ˢᵗ Dist. 1986); see also <u>Am. Home Assurance Co. v. Hermann's Warehouse Corp.</u>, 563 A.2d 444, 447-48 (N.J. 1989) and cases cited there (including <u>Casualty Ins.</u>); Jon Epstein, Annotation, <u>Liability of Insurer to Insured for Settling Third-Party Claim Within Policy Limits Resulting in Detriment to Insured</u>, 18 A.L.R.5th 474, 508-16 (1994) and cases cited there).[4]

_____

[4] Airborne argues for the minority view, represented by <u>St. Paul Fire & Marine Insurance Co. v. Edge Memorial Hospital</u>, 584 So.2d 1316, 1326-27 (Ala. 1991) and <u>National Service Industries, Inc. v. Hartford Accident & Indemnity Co.</u>, 661 F.2d 458, 462 (5ᵗʰ Cir. 1981), that when the insured has a financial stake in the settlement, including a significant deductible, the law requires the insurer to obtain the insured's consent before settlement

Airborne nonetheless contends that other Policy language is in conflict with Paragraph II.A, assertedly creating an ambiguity as to the parties' respective settlement authority.  Most directly Airborne looks to the very next paragraph ("Paragraph II.B") of Endorsement No. 10 (A. St. Ex. 31) in which American Protection states:

> B.    If we choose not to investigate any "accident" or not to defend any "suit" against the insured, you will see to it that all necessary investigation and defense is made, and will, to the best of your ability effect settlement we agree to.  You agree to discharge this obligation solely by means of your contract with the claim service provider stated in the schedule of this endorsement for claim adjustment services.  If such services do not run to the ultimate disposition of all claims or "suits" to which this insurance applies, we shall have the right to approve a replacement or to assign National Loss Control Services Corporation to provide claim adjustment services at your expense.

As Airborne would have it, at least when it bore the lion's share of the responsibility for investigating and defending an underlying lawsuit, as was the case here, Paragraph II.B gave it settlement authority in conflict with the settlement authority afforded to American Protection in Paragraph II.A.  That contention, however, lacks any solid foundation, for fairly read

---

regardless of the explicit terms of the contract.  Under Erie v. Tompkins principles as taught by our Court of Appeals, this Court's function is to predict what the Illinois Supreme Court would do if confronted by the issue--and where the only Illinois Appellate Court decision has conformed to the majority view, this Court sees no predicate for rejecting the parties' explicit contractual agreement in favor of that minority view.

those two paragraphs are entirely consistent, indeed complementary.

Paragraph II.B, which provides instructions to Airborne regarding settlements, plainly addresses situations where American Protection chooses not to participate in the resolution of a claim, leaving the responsibility to Airborne to defend or settle.  If for example the potential exposure of an underlying claim does not appear to threaten the $1 million layer of American Protection's coverage (the $2 million Policy limit less the $1 million Deductible Amount), it could plainly consider that only Airborne's interests would be at risk, accordingly leaving Airborne to take the lead oar in litigating or settling the matter.

By contrast, Paragraph II.A has defined American Protection's reserved right to take over the defense and effect settlement when it so chooses--note that Paragraph II.B also applies only when American Protection "chooses" a more passive role.  Were it otherwise, American Protection would be helpless to protect itself if Airborne began to negotiate a less-than-favorable settlement, effectively with the use of American Protection's money (not much "protection" in those circumstances!) or, as here, if Airborne insisted on litigating a claim so as to place American Protection's policy layer at risk.

In sum, the two provisions are wholly harmonious, and the

Policy language permits exactly the course of action followed by American Protection here. Paragraph II.B allowed American Protection to sit back and allow Airborne to investigate and defend the <u>Garcia</u> Action, a course of conduct that could have included attempted settlement if Airborne so chose.[5] At the same time Paragraph II.A gave American Protection the authority to step in, take the lead oar and steer the ship to the safe harbor of settlement if American Protection concluded that the waters Airborne was attempting to navigate were too risky for American Protection and AIG as the excess insurer.

Airborne also seeks to create confusion by pointing to Sections II.A.3 and II.B.3 of the Policy's General Terms and Conditions (A. St. Ex. 32):

> A.3. Kemper[6] will issue checks for claim payments and expenses in amounts consistent with the investigation and evaluation of liability and damages. For losses exceeding the amount stated as the Consultation level in Custom Claim Services provisions of the Declarations, Kemper will endeavor to consult with Client [Airborne] before settlement or payment where such consultation is permitted by law.

---

[5] Note, however, that Paragraph II.B specifically spoke of Airborne's obligation, in that event, to seek a "settlement we [American Protection] agree to." That meshes neatly with American Protection's right to take over under Paragraph II.A if it did not perceive Airborne's efforts as producing a satisfactory result.

[6] [Footnote by this Court] As n.1 indicates, American Protection is one of the Kemper subsidiaries, and the General Terms and Conditions are written in terms of the parent but are used by the various subsidiaries in the policies they issue.

*          *          *

     B. Client agrees to:

          3. Be responsible and pay for and indemnify
          Kemper for any loss or expense incurred by
          Kemper as a result of any claim of bad faith,
          fraud or negligence arising out of the
          rejection of a settlement or from any other
          action by Kemper based on the direction,
          instruction or negligence of Client or from
          Client's failure to fund the Loss Fund.

But those provisions, respectively creating a duty on American

Protection's part to consult with Airborne before settlement and

providing for indemnification of American Protection when it is

subjected to liability by acts of Airborne including the bad

faith rejection of a settlement, simply do not conflict with

American Protection's clear right to effect settlement in

Paragraph II.A.  Moreover, to allow those general provisions

(such as an "endeavor to consult" undertaking) to trump the

specific and express contractual provisions as to the handling of

settlements-- particularly where Airborne was asked to settle but

insisted on pursuing the litigation instead--would do violence to

the principles of contract construction.

     In short, looking only at the "four corners" of the contract

(Camico Mut. Ins. Co. v. Citizens Bank, 474 F.3d 989, 992-93 (7th

Cir. 2007), applying Illinois law), the Policy gave American

Protection an unambiguous power to settle a third-party lawsuit

against its insured, Airborne, even when that settlement

committed Airborne's Deductible Amount over its objection.  While

the Illinois caselaw indicates that this Court need not look
beyond that clear language (see, e.g., id. and Air Safety, Inc.
v. Teachers Realty Corp., 185 Ill.2d 457, 463-65, 706 N.E.2d 882,
884-85 (1999))[7], Airborne attempts to proffer evidence of a
course of dealing between itself and American Protection that it
believes sheds a different light on the issue.  Bearing in mind
the Illinois Supreme Court's instructions in Nicor, 223 Ill.2d
at --, 860 N.E.2d at 286 not to divorce the language of an
insurance contract from the factual setting in which it was
formed, as well as the course-of-dealing provision of the
Illinois Commercial Code (810 ILCS 5/1-205),[8] which applies to
all commercial contracts (Capitol Converting Equip., Inc. v. LEP
Transp., Inc., 965 F.2d 391, 395 n.5 (7th Cir. 1992)), this
opinion will briefly address Airborne's course-of-dealing
argument.

In that respect Airborne points to a series of "Claim
Handling Instructions," directed to its third-party administrator
Specialty Risk Services ("Specialty"), which reserved all
settlement authority to Airborne during earlier policy periods

_____

[7]  On that point it is important to note that the Policy's
General Terms and Conditions included an explicit integration
clause (A. St. Ex. 32).

[8]  Further citations to that Code will take the form
"Section --," omitting the prefatory "810 ILCS 5/."  Where an
entire Code article is referred to, it will be cited
"Article --."

from 1997 through 2002 (A. St. ¶¶56-69). Airborne has also tendered an affidavit from one of Specialty's claims adjusters who worked on the <u>Garcia</u> Action, stating that in her experience over the 2001 through 2003 policy years Airborne always litigated its own actions and reserved settlement authority for itself (<u>id</u>. Ex. 5).[9] Those submissions are offered in an effort to create the inference that the Policy now at issue included an understanding that American Protection had no settlement authority for the Deductible Amount, in purported conflict with the unconditional and unambiguous authority reserved to American Protection under Paragraph II.A.

But nothing in Airborne's submissions suggests (let alone creating any reasonable inference) that those claim handling instructions or the claim handler's experience ever addressed a situation in which American Protection attempted (or desired) to settle a claim, but nonetheless ultimately deferred to Airborne due to some understanding of Airborne's superior authority. Neither those claims handling instructions nor the affidavit adds

---

[9] American Protection has filed a motion to strike that affidavit as irrelevant to the issues now at hand. This Court has taken that motion with the merits. Because, as explained here, the affidavit does not at all do the job that Airborne has sought to assign to it, the motion might possibly be granted for that reason. But that could perhaps be said of any matters offered unsuccessfully in support of or opposition to summary judgment, and it seems more orderly to deny the motion and simply view the affidavit as insufficient unto the day. This Court does so.

anything to Airborne's authority under Paragraph II.B, which has already been held ineffective to prevent American Protection from exercising its unfettered right to settle under Paragraph II.A. With no dog in any fight between Airborne and its third-party administrator about which of them controlled settlement decisions as between themselves, American Protection would have had no need to exercise its contractual authority to litigate or settle a case.

In short, nothing in the history of earlier litigation vitiates the clarity of the Policy's language conferring absolute settlement power on American Protection if it chose to exercise it. That is how the Policy must be read. As Section 1-205(4) instructs, "[t]he express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other...."

Airborne also seeks to advance a "course of performance" argument based essentially on the fact that in the discussions between Airborne's people and Honan, she repeatedly referred to the $1 million deductible in the Policy as a "self-insured retention" rather than as a "deductible" (see, e.g., A. St. ¶21). Airborne speaks of that distinction in terms of a self-insured retention typically placing full control (including settlement authority) in the insured over the utilization of its insurance layer (id. ¶17). But that argument fails as well.

To begin with, under the Commercial Code any course-of-performance evidence reflecting the parties' conduct after execution of their contract, when offered to alter the unambiguous meaning derived from the plain language of the contract, is admissible only as to transactions in <u>goods</u> (Section 2-102; see also this Court's opinion in <u>Indep. Mach., Inc. v. Kuehne & Nagel, Inc.</u>, 867 F.Supp. 752, 764 n.13 (N.D. Ill. 1994)).  Second, even if such evidence were to be considered, any mistaken understanding of the contract under which Honan may have labored (at least up to the point that she exercised American Protection's Paragraph II.A power) cannot alter the agreement plainly set forth in the Policy language (see <u>R.O.W. Window Co. v. Allmetal, Inc.</u>, 367 Ill.App.3d 749, 755, 856 N.E.2d 55, 61 (3d Dist. 2006)).

In sum, Airborne has provided no basis for reading and applying Paragraph II.A in any manner different from its plain language.  And that language expressly grants American Protection the power to settle a third-party claim without Airborne's consent, entitling it to recoup the Deductible Amount from Airborne.

<u>Equitable Arguments</u>

Having failed to shake the impact of the Policy's unambiguous language, Airborne attempts to fall back on two equitable arguments to block American Protection from enforcing

16

its rights under Paragraph II.A: equitable estoppel and waiver. Once again, neither contention has merit.

As for equitable estoppel, <u>R & B Kapital Development, LLC, v. North Shore Community Bank & Trust Co.</u>, 358 Ill.App.3d 912, 922, 832 N.E.2d 246, 255-56 (1st Dist. 2005)(citations and internal quotation marks omitted) has summarized Illinois law:

> The doctrine of equitable estoppel prevents a party from asserting a right it would otherwise be able to assert. In order to establish equitable estoppel, the party must show that it was led to detrimentally rely upon the conduct or statements of the opposing party and that such reliance was in good faith. It is established that a party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others. Thus, to benefit from equitable estoppel, the party claiming it must have had no knowledge or means of knowing the true facts.

Airborne contends that Honan's statements referring to Airborne's control of its own funds misled it to believe that Airborne could control settlement and caused Airborne to expend resources in defending the <u>Garcia</u> Action, something that it would not have done had it known that American Protection could walk in and force settlement.[10] But the above-quoted language teaches that detrimental reliance must be <u>reasonable</u> (see, e.g., <u>RLI Ins. Co.</u>

---

[10] On that score American Protection says that the insurer that contributed the other $1 million to the settlement, not Airborne, was footing the bills to defend the <u>Garcia</u> Action (Resp. Mem. 2), and Airborne has not said otherwise. But wherever the truth lies in that regard, Airborne's argument fails for the reason stated in the text.

v. Ill. Nat'l Ins. Co., 335 Ill.App.3d 633, 645, 781 N.E.2d 321, 331 (1st Dist. 2002)), and as a matter of law that surely cannot be said here, when Dietz had only to read the Policy to recognize the unconditional power vested in American Protection.

And as to waiver, Airborne argues that American Protection voluntarily relinquished its right to force settlement over Airborne's objection by (1) deferring to Airborne's defense of the litigation and (2) referring to the deductible as a self-insured retention. But to constitute a waiver of a legal right, such conduct by American Protection must be "inconsistent with any intention other than to waive it" (Liberty Mut. Ins. v. Westfield Ins., 301 Ill.App.3d 49, 53, 703 N.E.2d 439, 441 (1st Dist. 1998)). That applies squarely to American Protection's right to settle the Garcia Action as it did. Everything that has been said up to now rejects any such notion.

### Good Faith Performance

As its final attempted defense, Airborne argues that even if American Protection had the contractual right to settle the Garcia Action without Airborne's consent, American Protection failed to exercise its discretion in good faith. To that end Airborne seeks to impose the same duty of good faith and fair dealing on an insurer's settlement of a third-party claim within policy limits, while calling upon its insured to come up with its large deductible (the case here), as the duty imposed when an

18

insurer settles an underlying claim for an amount beyond policy limits so as to expose the insured to personal liability--the latter situation requiring an insurer to take the interests of the insured into account (see, e.g., <u>Haddick ex rel. Griffith v. Valor Ins.</u>, 198 Ill.2d 409, 416, 763 N.E.2d 299, 304 (2001)).

But <u>Casualty Insurance</u>, 147 Ill.App.3d at 570, 498 N.E.2d at 1179 has specifically rejected that notion:

> [The insurer] had the right to settle the case within the policy limits and its duty of good faith, therefore, was not a material factual issue. Under such circumstances, the trial court did not abuse its discretion in granting [the insurer's] summary judgment motion.

While Airborne certainly risked significant personal liability in this case because of the large deductible, that risk was exactly what it had contracted for.

This Court will therefore follow the direction of Illinois caselaw by holding American Protection only to the duty of good faith that is the normal expectation under any contract--not some higher standard. In that respect <u>Citicorp Savings of Illinois v. Rucker</u>, 295 Ill.App.3d 801, 692 N.E.2d 1319, 1324 (1st Dist. 1998) has explained:

> The doctrine of good faith then requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

Airborne contends that American Protection breached that duty by exercising its discretion to settle the <u>Garcia</u> Action

despite knowing that Airborne had multiple bona fide legal defenses that might absolve Airborne of any liability in the underlying suit.  In Airborne's view American Protection did that without regard to Airborne's interests, motivated instead by the desire to save itself $150,000 off of its maximum potential liability and in response to pressure from AIG, which did not want to risk its own policy layer.

But that argument undermines Airborne's own position.  Even on the premise that those were its motivations, American Protection was clearly concerned that the potential litigated judgment in the case could be far more than the available settlement figure. That being so, American Protection's exercise of its discretion to settle to avoid that risk was not at all arbitrary or capricious.  Even if American Protection had misjudged the likelihood of success of Airborne's defenses (a hypothetical not established by the evidence), that would only have made its decision to settle a bad call, not bad faith (see Am. Home Assurance Co., 563 A.2d at 448).

Damages

In summary, American Protection has succeeded in demonstrating that there is no genuine issue of material fact to challenge the holdings (1) that the Policy gave American Protection the power to settle the Garcia Action over Airborne's objection and (2) that American Protection fully performed its

responsibilities under that contract in good faith. Section III of Policy Endorsement No. 10 also required Airborne to reimburse American Protection for any part of the Deductible Amount that American Protection paid out to effect settlement (A. St. Ex. 31). Because Airborne has not reimbursed American Protection (A.P. St. ¶32) as that section required, Airborne is in breach and American Protection is entitled to damages.

In that regard Airborne has proffered nothing in the way of evidence to challenge the collectibility of the full Deductible Amount. All that it has said in it's a. Resp. St. ¶32, responding to American Protection's statement that it "never paid the deductible," is this:

> Airborne admits that it has never paid the amount of the purported deductible, less the erosion by defense costs and attorneys' fees.

But that "less" assertion is not backed up by any evidentiary support, in direct violation of LR 56.1(b)(3)(B). In addition, Airborne's Reply Memorandum is entirely silent in response to the statement in American Protection's Mem. 14 that Airborne is obligated to pay the entire $1 million[11] plus prejudgment interest on that liquidated amount (citing in that

---

[11] It will be recalled that American Protection's Resp. Mem. 2 states that the same insurer that kicked in the other $1 million toward settlement of the <u>Garcia</u> Action, and not Airborne itself, had paid for Airborne's defense in that case. Airborne has not sought to challenge that assertion (either indignantly or otherwise).

respect 815 ILCS 205/2 and <u>Dallis v. Don Cunningham & Assocs.</u>, 11 F.3d 713, 718 (7th Cir. 1993)).  On the record that the parties have tendered to this Court, then, American Protection is entitled to a judgment in that amount.

## Conclusion

Because there is no genuine issue of material fact either (1) as to American Protection's right to settle the <u>Garcia</u> Action over Airborne's objection or (2) as to Airborne's breach in failing to reimburse American Protection in the Deductible Amount, American Protection's Rule 56 motion is granted, while Airborne's cross-motion is of course denied.  Judgment is ordered to be entered in favor of American Protection and against Airborne in the sum of $1 million plus prejudgment interest from the November 2004 date of American Protection's payment in settlement of the <u>Garcia</u> Action.  This action is set for 9 a.m. March 26, 2007 for the entry of judgment (for which purpose American Protection shall tender to Airborne and this Court its calculation of the judgment amount not later than March 19.

_____
Milton I. Shadur
Senior United States District Judge

Date:  March 9, 2007

22